UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN KOLAR, individually and as trustee of the GB Money Purchase Trust,<br><br>Plaintiff,<br><br>v.<br><br>SKINNER, INC.,<br><br>Defendant. | Case No.: 1:21-cv-_____<br><br>**COMPLAINT** |

## INTRODUCTION

Plaintiff John Kolar ("Plaintiff" or "Mr. Kolar") brings this action against Defendant Skinner, Inc. ("Defendant" or "Skinner") arising out of Skinner's wrongdoing in connection with Skinner's auction sale of certain collectible items belonging to Mr. Kolar either individually or as trustee of the GB Money Purchase Trust (the "Trust"). As set forth below, Skinner has failed to pay substantial amounts owed or promised to Mr. Kolar. As such, Skinner has breached its contract with Mr. Kolar, breached the implied covenant of good faith and fair dealing, breached the fiduciary duties it owed Mr. Kolar, committed promissory estoppel or been unjustly enriched, and violated Chapter 93A of the Massachusetts General Laws.

## PARTIES

1. Mr. Kolar is an individual residing at 142 Timber Lane, Lebanon, Pennsylvania 17042.

2. Mr. Kolar is the trustee of the Trust.

3. The Trust is a federally-regulated retirement trust established under federal law and the laws of the State of Ohio.

4. Skinner is a Massachusetts corporation with a principal place of business at 274

Cedar Hill Street, Marlborough, Massachusetts 01752.

5. Skinner's registered agent for service is Kristina L. Sutton, Chief Financial Officer and Secretary, Skinner, Inc., 274 Cedar Hill Street, Marlborough, Massachusetts 01752.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides in this judicial district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## GENERAL ALLEGATIONS

### *Background*

8. Mr. Kolar spent over 25 years amassing a significant collection of pieces of Americana owned either by the Trust or by Mr. Kolar personally (the "Collection").

9. The Collection consisted of over 330 pieces.

10. By Mr. Kolar's own estimation, the Collection was worth at least $800,000.

11. In the spring of 2019, Mr. Kolar began considering selling the Collection.

### *Skinner's Proposal for Sale of the Collection*

12. Based on past experience, Mr. Kolar sought a proposal from Skinner (among other auction houses) for a consignment auction sale of the Collection.

13. Skinner proposed conducting a highly publicized single-owner public sale in Mr. Kolar's name, thus recognizing the value of the Collection.

14. Skinner's proposed sale would have no seller's costs of any kind, including costs for shipping, insurance, storage, and publication of a single-owner catalogue.

2

15. Additionally, Skinner's proposal contemplated that Mr. Kolar would be able to set reasonable reserves with accompanying estimates.

16. Skinner's proposal also contemplated that items that did not sell would be returned to Mr. Kolar in the same condition as delivered.

17. Finally, Skinner's proposal offered Mr. Kolar an advance of funds against the proceeds from the sale of the Collection.

18. Mr. Kolar agreed to Skinner's proposal, in part because of the positive experience he had in the past with Skinner but also because of certain representations that Skinner personnel—and in particular, Stephen L. Fetcher—made regarding the manner in which the sale would proceed.

### *The Skinner Contract*

19. After discussions and negotiations with Skinner, Mr. Kolar and Skinner entered into a contract on or about September 19, 2019, for the consignment and sale of the Collection at auction.

20. The contract consisted of a signed, pre-printed "Receipt" and written addenda in the form of a letter signed by Mr. Fletcher and an "Addendum A to Receipt Number TBD" on Skinner letterhead. A copy of the contract documents is attached hereto as **Exhibit A**.

21. Among other terms, the contract between Mr. Kolar and Skinner provided that: (a) Mr. Kolar and the Trust would pay no commission to Skinner; (b) Skinner would collect a buyer's premium fee (an amount the auction house typically retains over the sale price to pay for its services) equal to 23% of the hammer price from successful bidders; (c) Mr. Kolar and the Trust would pay no charge for packing, transporting, photographing, or storing the Collection; (d) Mr. Kolar and the Trust would pay no charge for promotion or marketing efforts, with such efforts including "promised advertisements featuring [the] Collection in *Antiques and Fine Art*

3

and *The Magazine Antiques*" as well as a single-owner printed catalogue for the Collection; (e) Mr. Kolar and Skinner would set mutually agreed-upon reasonable reserves; (f) Skinner would maintain insurance on the Collection while it was in Skinner's possession with charges for insurance waived; (g) Skinner would waive any buyback charges; and (h) the auction, as well as an exhibition, would be held in Skinner's Marlborough, Massachusetts gallery in August 2020.

22. After signing the contract with Skinner, Mr. Kolar allowed Skinner to pick up the pieces of the Collection—the majority of which were already packed and in storage, saving Skinner significant cost that it would have otherwise incurred under the contract.

23. Mr. Kolar also had to ship certain pieces of the Collection to Skinner at his own expense, even though Skinner had agreed under the contract that Mr. Kolar would pay no transportation costs.

*Application of the Advance*

24. Mr. Kolar took advantage of Skinner's offer to provide an advance against the sale of the Collection.

25. Rather than take the advance in the form of a cash payment, however, Mr. Kolar—with Skinner's approval—opted to take the advance in the form of credit up to $25,000 in purchases at Skinner's November 2019 Americana sale.

26. Mr. Kolar agreed to pay the difference directly to Skinner if he purchased goods valued in excess of this amount.

27. As such, Mr. Kolar applied a credit of $22,116.50 to his purchase of $36,000 worth of goods at the November 2019 sale and paid Skinner the balance of $13,883.50 by check.

28. Despite Skinner's consent to this use of an advance, Skinner's accounting department began demanding payment for the $22,116.50 in January 2020.

29. On at least three occasions, Mr. Kolar informed Skinner's accounting personnel to

contact Mr. Fletcher, who had agreed that the amount due would be paid from proceeds of the sale of the Collection.

30. Nevertheless, Skinner took the drastic step of cutting off Mr. Kolar's ability to bid in Skinner's auctions, resulting in additional harm to Mr. Kolar until the issue was resolved in April 2020 when Skinner's accounting department confirmed that the $22,116.50 would be paid from the Collection's sales proceeds.

### *Lead Up to the Sale of the Collection*

31. As reflected in the contract, Skinner intended to sell the Collection in August 2020 to coincide with New England Antiques Week.

32. In addition to online and telephonic auction components, the contract contemplated an in-person exhibition and auction.

33. Mr. Kolar spent significant amounts of time discussing the particulars of the sale with Mr. Fletcher.

34. Mr. Fletcher, on behalf of Skinner, materially deceived Mr. Kolar as to the manner in which the Collection would be presented and sold.

35. These deceptions include, but are not limited to, false representations regarding (a) the preparation and format of the proposed single-owner catalogue; (b) online promotion of the sale of the Collection; (c) distribution of a printed mailer advertisement to over 24,000 Skinner Americana clients; (d) the particulars for the exhibition of the Collection in Skinner's gallery; and (e) the manner in which Skinner conducts its online auction component.

36. Ultimately, Skinner did not follow through on any of these representations, instead attempting to save itself at least $70,000 in marketing expenses that it had agreed to cover and otherwise driving down the sale prices for the Collection.

37. Skinner did not produce the catalogue in the format discussed, namely a

standalone document published in hard copy, with a complete description and photographs of each lot. Instead, Skinner produced only an online brochure summarizing the Collection in a few pages, combined with summaries of the other collections or pieces that Skinner was featuring as part of its August Americana sale.

38. Nor did Skinner "blitz the Internet" about the sale or the quality of the pieces in the Collection. Instead, Skinner issued a single email to Skinner's clients and posted a single Facebook story about a single item in the Collection.

39. Nor did Skinner distribute a mailer regarding the Collection and Skinner's proposed single-owner sale of the Collection.

40. Nor did Skinner display the Collection in its gallery. Instead, Skinner left all pieces of the Collection in Skinner's warehouse where they were marked with small, hard-to-read lot tags and mixed in with (and in many cases, obstructed by) pieces from other collections.

41. Moreover, Skinner did not store and maintain pieces of the Collection in a proper fashion, as demonstrated by the manner in which it "displayed" the Collection at its warehouse and by the fact that at least one piece of the Collection sold through Skinner (a weathervane) was damaged.

42. Skinner represented that it would conduct its online auction by closing out lots one at a time and extending the closing of a lot by five minutes if a bid was placed on that lot in the final five minutes of scheduled bidding. As discussed below, Skinner did not conduct its online auction for the sale of the Collection in this manner.

### *The Sale of the Collection*

43. Due to the COVID-19 pandemic and the restrictions associated therewith, in May 2020, Mr. Kolar contacted Skinner to discuss potential cancelation of the sale of the Collection.

44. Nevertheless, Skinner insisted that the sale proceed. Mr. Fletcher assured Mr.

Kolar that there would still be a printed catalogue, that there would still be a full exhibition of the Collection in the Skinner gallery, and that Massachusetts COVID-19 restrictions would not preclude Skinner from getting prospective buyers into the gallery in-person to see the exhibition prior to the sale.

45. Mr. Kolar had other calls with Mr. Fletcher throughout the summer of 2020 to discuss cancelation of the sale of the Collection in light of both the COVID-19 pandemic and the corresponding cancellation of various shows associated with New England Antiques Week. Mr. Fletcher continued to insist that Skinner proceed with the sale in August 2020.

46. Skinner conducted the sale of the Collection as part of a larger August Americana auction from August 3 through August 12, 2020. Skinner divided the Collection into 332 lots.

47. Skinner conducted its online auction by closing out lots ten (or more) at a time (rather than one-by-one), making it difficult (if not impossible) for buyers to bid on multiple lots that were closing at the same time and reducing the overall duration of the sale, and by declining to extend bidding for an additional five minutes should a bid be placed in the last five minutes of scheduled bidding.

48. With the COVID-19 restrictions limiting the auction to be conducted primarily online, the implications of Skinner's falsely-represented method of running its online auction component were heightened.

49. Similarly, upon information and belief, Skinner's website froze numerous times during the sale, further compounding the problems with its online auction component.

*Calculation of the Sale Proceeds*

50. Of the 332 lots, 317 were sold for a total price of $366,695 before application of the buyer's premium. Eleven (11) lots went unsold and four (4) lots were withdrawn or not otherwise included in the sale.

51. Deducting the advance of $22,116.50 yields sale proceeds of $344,578.50 due to Mr. Kolar and the Trust under the parties' contract.

52. Subsequently, Skinner cancelled the sale of an additional thirty-seven (37) lots.

53. Thirty (30) of these were lots that a dealer, Greg Kramer, purchased. Despite the fact that prior to the sale, Mr. Kolar and Mr. Fletcher arranged for Mr. Kramer to have sixty (60) days to make payment for items he purchased, when Mr. Kramer arrived at Skinner to obtain the items he purchased, Skinner refused to accept Mr. Kramer's payment tender on the agreed terms and refused to deliver the items purchased to Mr. Kramer.

54. Specifically, Skinner cancelled the sale of the following lots to Mr. Kramer:

| Lot Number | Description |
|---|---|
| 1008 | Slip Branch-decorated Pearlware Bowl |
| 1025 | Two Spatterware Cups and Saucers |
| 1026 | Two Spatterware Cups and Saucers |
| 1030 | Miniature Sponge-painted Classical Bureau |
| 1044 | Watercolor and Pen and Ink Birth and Baptismal Fraktur for Maria Gerhart |
| 1045 | Watercolor Birth Fraktur for Rachel Gaff |
| 1055 | Mustard Yellow Smoke-painted Six-board Chest |
| 1064 | Paint-decorated Fancy Chair |
| 1084 | Ohio Pottery Factory Matchsafe |
| 1085 | Large Slip-decorated Glazed Redware Plate |
| 1086 | Slip-decorated Redware Plate |
| 1089 | John Bell Redware Flowerpot |
| 1094 | Large "E.D.C. Singer" Glazed Redware Dish |
| 1144 | Paint-decorated Scholaire Blanket Chest |
| 1148 | Paint-decorated Poplar Slide-lid Candle Box |
| 1159 | Child's Paint-decorated Slide-lid Pencil/Pen Box |
| 1179 | Reverse-painting on Glass "General Lafaiette" |
| 1194 | Painted Split-baluster Mirror |
| 1212 | Two-gallon Cobalt-decorated Jug |
| 1214 | Miniature Cobalt-decorated Stoneware Jug |
| 1215 | Miniature Cobalt-decorated Stoneware Jug |
| 1216 | Miniature Cobalt-decorated Stoneware Jug |
| 1228 | Wagner Pottery Floral Applied Vase |
| 1230 | Slip-decorated Glazed Redware Plate |
| 1231 | Willoughby Smith Slip-decorated Redware Dish |
| 1232 | Willoughby Smith Slip-decorated Redware Dish |

| | |
|---|---|
| 1233 | Black-glazed Redware Jug |
| 1234 | Two Manganese-decorated Redware Bowls |
| 1235 | Tulip Decorated Glazed Redware Plate |

55. The sale price on the thirty (30) lots that Mr. Kramer purchased was $20,605.00 before application of the buyer's premium.

56. Skinner cancelled the other seven (7) lots that were cancelled post-sale without reason or explanation to Mr. Kolar.

57. Specifically, Skinner cancelled the sale of the following lots without reason or explanation:

| Lot Number | Description |
|---|---|
| 1146 | Blue-painted Compass Artist Decorated Slide-lid Candle Box |
| 1211 | Cobalt-decorated Stoneware Jar |
| 1239 | Miniature Glazed Redware Pitcher |
| 1241 | Miniature Southern Mottled Green-glazed Redware Pitcher |
| 1243 | Miniature Green-splotched and Yellow-glazed Redware Dish |
| 1244 | Three Miniature Glazed Redware Dishes |
| 1252 | Splotch-decorated Redware Dish |

58. The sale price on these seven (7) lots was $2,430.00 before application of the buyer's premium.

59. Between October 7, 2020 and December 16, 2020, Skinner tendered to Mr. Kolar four checks in the total amount of $318,818.50. Mr. Kolar and the Trust accepted the checks as partial payment, without prejudice to recover additional amounts owed. Such acceptance does not constitute an accord and satisfaction.

60. Application of the checks to the net sales proceeds of $344,578.50 leaves an undisputed balance of $25,760.00 owed to Mr. Kolar and the Trust prior to the improper cancellation of the sale of the lots Mr. Kramer purchased and the seven (7) lots Skinner cancelled without reason or explanation. Taking into account Skinner's improper cancellation of $23,035.00 worth of sales leaves at least $2,725.00 due to Mr. Kolar and the Trust.

9

61. Additionally, Skinner did not return the pieces of the Collection comprising unsold, withdrawn, or cancelled lots until January 14, 2021, despite repeated demands by Mr. Kolar for Skinner to return those pieces earlier.

62. Nor did Skinner return to Mr. Kolar 200 copies of a $20 per unit weathervane book that Skinner failed to distribute to customers as directed by Mr. Kolar until January 14, 2021, despite repeated demands by Mr. Kolar for Skinner to return the books earlier.

### *Skinner's Actions Caused Depressed Sales Figures*

63. Had Skinner performed its contractual obligations and adhered to its extracontractual representations, the sale of the Collection would have achieved *at least* $433,305 in additional sale proceeds.

64. Many pieces of the Collection purchased during Skinner's August 2020 sale, at depressed prices because of Skinner's conduct, have subsequently been sold through other Internet sales and by many well-known antique dealers at anywhere up to five times the amount garnered through Skinner's sale.

65. For example, upon information and belief, the following items sold in Skinner's sale have since been re-sold at higher prices:

| Item | Skinner Lot Number | Sale Price | Re-Sale Location | Re-Sale Price |
|---|---|---|---|---|
| Mochaware pitcher | 1009 | $438 | eBay | $950 |
| Mocha bowl | 1016 | $313 | eBay | $695 |
| Cortland stoneware tulip jug | 1209 | $875 | Antique Dealers Association | $1,250 |
| Red ware yellow slip with brown manganese glaze flower pot | 1227 | $125 | eBay | $475 |
| New England red ware jug | 1251* | $150 | Renningers Adamstown flea market | $375 |
| Pair of New England cobalt candlesticks | 1260 | $344 | eBay | $1,150 |

---

* Lot 1251 consisted of two jugs, one of which has been re-sold.

| | | | | |
|---|---|---|---|---|
| Oil-on-canvas painting | 1282 | $500 | Dennis Raleigh Antiques | $1,450 |
| Coverlet | 1329 | $281 | eBay | $899 |

66. Similarly, many pieces of the Collection purchased during Skinner's August 2020 sale, at depressed prices because of Skinner's conduct, have subsequently been listed for sale through other channels at anywhere up to five times the amount garnered through Skinner's sale.

67. For example, upon information and belief, the following items sold in Skinner's sale have since been listed for sale at higher prices:

| Item | Skinner Lot Number | Sale Price | Listing Location | Listing Price |
|---|---|---|---|---|
| Lehn ware Sugar bucket | 1035 | $1,125 | Antique Dealers Association | $2,200 |
| Weathervane | 1071 | $750 | Pook and Pook Auctions | $3,000-$5,000 |
| Painted Parcheesi game board | 1158 | $750 | Main Antique Digest | $1,750 |
| Toleware bread tray | 1270 | $200 | Dennis Raleigh Antiques | $575 |

***Skinner's Separate Promise to Remit the Buyer's Premium***

68. After learning of the issues with the sale, Mr. Kolar contacted Mr. Fletcher promptly after the conclusion of the sale of the Collection.

69. During a call on the morning of Friday, August 14, 2020, Mr. Fletcher acknowledged the various problems that had occurred and immediately offered to give Mr. Kolar and the Trust "the entire buyer's fee to make things right."

70. The buyer's fee amounts to an additional $91,713 separate from any sales proceeds owed to Mr. Kolar and the Trust.

71. Skinner has not paid this amount to Mr. Kolar despite its promise to do so.

**COUNT I**
**(Breach of Contract – Failure to Pay Sales Proceeds)**

72. Plaintiff repeats and incorporates by reference all of its allegations set forth above

11

as though fully stated herein.

73. Almost three hundred (300) days have now passed since the conclusion of the sale, and Skinner has not paid Mr. Kolar and the Trust the full balance of the sale proceeds. Skinner has thus breached paragraph 12 of the "Receipt" portion of the parties' contract, which states that "[p]rovided that Skinner has received full payment from Buyer, or has released possession of the Property to Buyer, Skinner shall pay Consignor the net proceeds from any sale of the Property, less commissions and other amounts due Skinner hereunder, *on or before the 35th day after the auction sale* (or, if applicable, the next business day)" (emphasis added).

74. Mr. Kolar and the Trust are entitled to recover the balance of at least $2,725.00, and up to $25,760.00, from Skinner for the unpaid sales proceeds (prior to application of the buyer's premium) for lots that Skinner sold or improperly cancelled.

## COUNT II
**(Breach of Contract – Failure to Conduct Sale in Accordance with Terms)**

75. Plaintiff repeats and incorporates by reference all of its allegations set forth above as though fully stated herein.

76. Skinner also breached its contract with Mr. Kolar by:

    a. Failing to produce a single-owner catalogue, which not only provides information about the sale to prospective buyers but also serves as a marketable collectible itself and a memorialization of the Collection for the seller (i.e., Mr. Kolar and the Trust);

    b. Failing to place the agreed-upon advertisements for the sale of the Collection and charging Mr. Kolar $600 to run one advertisement in the *Antiques and Auction News* newspaper;

    c. Setting low estimates (and thus reserve limits) at less than agreed-upon amounts;

        d.      Refusing to engage in good-faith discussions about estimates or reserve amounts;

        e.      Purporting to charge a commission of 30% of the final bid price up to and including $1,000, 20% of the final bid price over $1,000 up to and including $10,000, or 10% of the final bid price over $10,000, subject to a $40 minimum commission, for each lot sold and 10% of the low estimate, subject to a $40 minimum commission, for each lot that was not sold;

        f.      Purporting to charge a 1.5% insurance charge;

        g.      Purporting to charge a 35% per lot withdrawal charge;

        h.      Charging a buyer's premium fee of 25% rather than the agreed-upon fee of 23%;

        i.      Failing to conduct an in-person, properly-promoted gallery exhibition of the Collection in conjunction with the sale, allowing prospective buyers the ability to see the pieces in the proper setting;

        j.      Failing to return unsold, withdrawn, or cancelled pieces of the Collection to Mr. Kolar and the Trust in a timely manner;

        k.      Failing to reimburse Mr. Kolar for costs he incurred to transport pieces of the Collection to Skinner;

        l.      Improperly cancelling the sale of thirty-seven (37) lots; and

        m.      Failing in good faith to consider the impact of COVID-19 and cancel or reschedule the auction.

      77.      These breaches have resulted in additional damages to Mr. Kolar and the Trust, including but not limited to reduced sale prices of the pieces of the Collection, amounting to at least $433,305.

      78.      Mr. Kolar seeks to recover damages for these breaches of contract in an amount to

be determined at trial.

## COUNT III
### (Breach of Implied Covenant of Good Faith)

79. Plaintiff repeats and incorporates by reference all of its allegations set forth above as though fully stated herein.

80. Under Massachusetts law, every contract includes an implied covenant of good faith and fair dealing.

81. The contract between Skinner and Mr. Kolar is governed by Massachusetts law.

82. Skinner's mishandling of the sale of the Collection, refusal to work with Mr. Kolar in good faith to properly carry out the sale, and wanton disregard for its contractual obligations to Mr. Kolar demonstrate a lack of good faith and fair dealing.

83. Skinner has breached the implied covenant of good faith contained in its contract with Mr. Kolar.

84. As a result of Skinner's breach, Mr. Kolar and the Trust have been harmed by, among other things, not receiving the full amount of sale proceeds owed to them and not receiving full market value for the items of the Collection that Skinner sold.

85. Mr. Kolar seeks to recover damages for these breaches of the implied covenant in an amount to be determined at trial.

## COUNT IV
### (Breach of Fiduciary Duty)

86. Plaintiff repeats and incorporates by reference all of its allegations set forth above as though fully stated herein.

87. By agreeing to sell pieces of the Collection on consignment through an auction sale, Skinner undertook fiduciary duties of loyalty, obedience, accounting, and care to Mr. Kolar.

88. By failing to maximize the sale price of the pieces of the Collection sold, by

failing to adhere to Mr. Kolar's instructions and directives regarding the sale, by failing to properly care for the pieces of the Collection in its custody, and by improperly accounting for the sale of pieces of the Collection, Skinner breached its duties to Mr. Kolar.

89. Mr. Kolar seeks to recover damages for these breaches of fiduciary duty in an amount to be determined at trial.

## COUNT V
### (Unjust Enrichment / Promissory Estoppel)

90. Plaintiff repeats and incorporates by reference all of its allegations set forth above as though fully stated herein.

91. Skinner's promise, as reflected by Mr. Fletcher's statements to Mr. Kolar on August 14, 2020, to pay Mr. Kolar the buyer's premium fee that Skinner charged, in the amount of $91,713 (before improper cancellation of the sales of thirty-seven (37) lots), is a separate and enforceable implied contract.

92. Despite Mr. Kolar's demand, Skinner has subsequently refused to pay Mr. Kolar the buyer's premium fee that Skinner charged.

93. By refusing to pay Mr. Kolar the buyer's premium fee, Skinner breached that implied contract or, alternatively, has been unjustly enriched.

94. Skinner should be estopped from receiving the benefit of the buyer's premium fee in light of the promises it made to Mr. Kolar after the conclusion of the sale.

95. Mr. Kolar and the Trust have been damaged by Skinner's breach of its promise.

96. Upon information and belief, Skinner has attempted to exploit its consignment of the Collection in order to inflate its status in the antiques industry and promote other sales, for which Skinner would receive all the benefit and Mr. Kolar and the Trust would receive none.

97. Mr. Kolar seeks damages in an amount to be determined at trial as a result of

Skinner's breach of this promise or, alternatively, Mr. Kolar seeks to recover any amounts by which Skinner has been unjustly enriched as a result of Skinner's conduct with respect to the buyer's premium.

### COUNT VI
### (Violation of G.L. Chapter 93A, §§ 2 & 9)

98. Plaintiff repeats and incorporates by reference all of its allegations set forth above as though fully stated herein.

99. Skinner is a business that operates in trade or commerce.

100. A substantial portion of Skinner's business dealings with Mr. Kolar occurred within the Commonwealth of Massachusetts.

101. Skinner's improper conduct in connection with the consignment and sale of the Collection constituted unfair or deceptive acts or practices in violation of section 2 of Chapter 93A.

102. Skinner's unfair or deceptive conduct includes its cutting off of Mr. Kolar's bidding authority at Skinner sales for a period of approximately three months, its blatant disregard for its contractual, fiduciary, and bailment obligations to Mr. Kolar, its misrepresentations regarding the preparation and format of the single-owner catalogue, its failure to promote the sale of the Collection as discussed, its improper exhibition of the Collection in Skinner's warehouse (not its gallery), its conducting the online auction in a manner that did not comply with its representations, its improper cancellation of the sale of thirty-seven (37) lots, its refusal to pay Mr. Kolar the buyer's fee premium, and its delay in returning to Mr. Kolar all unsold, withdrawn, or cancelled pieces from the Collection and the weathervane books.

103. Skinner's unfair or deceptive conduct was a willful or knowing violation of section 2 of Chapter 93A.

104. Mr. Kolar and the Trust have been injured by Skinner's unfair or deceptive conduct. Such injury includes, but is not limited to, not receiving the full amount of proceeds from the sale of the Collection, not receiving full market value for the pieces of the Collection sold (as discussed above), not receiving the buyer's premium fee, and being dispossessed of personal property belonging to Mr. Kolar and the Trust for over four months.

105. On October 23, 2020, Mr. Kolar, through counsel, sent Skinner a Chapter 93A demand letter by first class mail, certified mail, and email. A copy of the demand letter is attached hereto as **Exhibit B**.

106. As a result of Skinner's violation of Chapter 93A, Mr. Kolar has been damaged in an amount to be determined at trial, plus treble damages, costs, interest, and attorney fees.

**WHEREFORE**, Plaintiff John Kolar, individually and as trustee of the GB Money Purchase Trust, requests that the Court:

    A.    Enter judgment and award damages in favor of Plaintiff on Counts I through VI of this Complaint;

    B.    Award treble damages and attorney fees in favor of Plaintiff on Count VI of this Complaint;

    C.    Award Plaintiff interest, costs and attorney fees as allowed by law; and

    D.    Order such other relief as may be just and appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS SO TRIABLE.**

Respectfully submitted,

**PLAINTIFF**

**JOHN KOLAR, Individually and as Trustee of GB Money Purchase Trust,**

By his attorneys,

*/s/ Roger L. Smerage*
Bradley L. Croft (BBO #633347)
Michael D. Rosen (BBO #561981)
Roger L. Smerage (BBO #675388)
**RUBERTO, ISRAEL & WEINER, P.C.**
255 State Street, 7th Floor
Boston, MA 02109
(617) 742-4200 (phone)
(617) 742-2355 (fax)
blc@riw.com
mdr@riw.com
rls@riw.com

Dated: June 1, 2021